UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| C-INNOVATION, LLC | CIVIL ACTION |
| VERSUS | NO: 25-1780 |
| PREMIER ACQUISITION HOLDINGS, LLC, ET AL. | SECTION: "A" (5) |

### ORDER AND REASONS

The following motions are before the Court: **Motion to Dismiss for Lack of Personal Jurisdiction (Rec. Doc. 15)** filed by Premier Acquisition Holdings, LLC, RMS Titanic, Inc., and Experiential Media Group 'EMG' LLC (collectively "the Titanic Defendants"); **Motion to Dismiss for Lack of Personal Jurisdiction (Rec. Doc. 16)** filed by Alta Fundamental Advisers SP LLC ("Alta") and Star V Partners LLC ("Star"); **Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service of Process (Rec. Doc. 19)** filed by Apollo Credit Strategies Master Fund Ltd. ("Apollo").

The plaintiff, C-Innovation, LLC, opposes the motions.

The motions, submitted for consideration on January 7, 2026, are before the Court on the briefs without oral argument.

**I.     Background**

This case arises out of the charter of C-Innovation's offshore supply vessel the M/V DINO CHOUEST, for use in an expedition ("Expedition 2024") to further explore and survey the wreckage of the RMS TITANIC off the coast of Newfoundland, Canada. C-Innovation is a Louisiana limited liability company (registered office in Cut Off,

Louisiana) that operates under the Edison Chouest Offshore trade name. The vessel charterer was an entity called Experimental Media Group "EMG" LLC ("EMG"), whose place of business is located in Georgia. (Rec. Doc. 25-4, Exhibit D-9 & Rec. Doc. 25-5, Exhibit E). EMG holds itself out to be "the leading provider of premier museum-quality exhibitions throughout the world and the recognized leader in developing and displaying unique exhibitions for entertainment and education." (Rec. Doc. 5, First Amended Complaint ("FAC") ¶ 17). In particular, EMG, in conjunction with RMS Titanic, Inc., created the "TITANIC: The Artifact Exhibition," an exhibition displaying more than 350 artifacts recovered from the TITANIC wreckage, and reportedly seen by more than 35 million people worldwide.[1] (*Id.*). The crux of the dispute in this lawsuit is that C-Innovation performed all of its obligations under the charter party—which included substantial modifications to the DINO CHOUEST to outfit it for its mission—yet to date outstanding payments of $4,000,000.00 remain due and unpaid despite numerous extensions and accommodations. (*Id.* ¶¶ 35-36).

      One or more of the defendants used the highly-specialized DINO CHOUEST and its equipment and crew to gather valuable voluminous media and data ("the Project Data") at the watery gravesite, which continues to fascinate people over a century following TITANIC's tragic demise. And surely one or more of the defendants stands to gain financially from exploiting the Project Data that C-Innovation's vessel was used to obtain.

---

[1] In 1994, the United States District Court for the Eastern District of Virginia awarded RMS Titanic, Inc., which is one of the Titanic Defendants herein, exclusive "salvor-in-possession" rights over the TITANIC wreckage. (Rec. Doc. 5, First Amended Complaint ("FAC") ¶ 16).

C-Innovation alleges that it owns the Project Data obtained during the charter to survey the TITANIC using the DINO CHOUEST. (*Id.* ¶ 30). On December 3, 2025, the Court granted C-Innovation's motion for a Rule C arrest of the Project Data, described as the hard drives containing footage and other data of the RMS TITANIC wreckage captured during the charter at issue in this matter.[2] (Rec. Doc. 20, Motion; Rec. Doc. 22, Order). On December 16, 2025, RMS Titanic filed a Statement of Right or Interest in the Project Data to assert its salvor's lien as the salvor-in-possession. (Rec. Doc. 30, Notice).

In addition to EMG, which was the sole named charterer of the DINO CHOUEST, C-Innovation has also brought suit against RMS Titanic and Premier Acquisition Holdings, LLC ("PAHL"), the latter of which is alleged to own EMG and RMS Titanic. (*Id.* ¶ 13). Alta Fundamental Advisers SP LLC ("Alta"), Apollo Credit Strategies Master Fund Ltd. ("Apollo"), PacBridge Partners I Investment Co. Ltd. ("PacBridge"), and Star V Partners LLC ("Star V") have been named as defendants because they allegedly operate PAHL, RMS Titanic, and EMG as their alter egos. (*Id.* ¶ 15). C-Innovation alleges that Alta, Apollo, PacBridge, and Star V intentionally undercapitalized PAHL, RMS Titanic, and EMG to avoid financial responsibility for contractual liability under the charter party. (*Id.* ¶ 14).

None of the defendant entities are Louisiana companies. According to the FAC,

---

[2] C-Innovation had actual physical possession of the Project Data at its Mandeville, Louisiana office when it moved for the arrest.
    RMS Titanic suggests that the arrest of the Project Data is inconsistent with its rights as salvor-in-possession. The Court does not agree. The Project Data can be seized and sold the same as any property should the debtor default on its financial obligations.

"Defendants" are subject to personal jurisdiction in this state as a result of their "suit-related activities and contacts in Louisiana giving rise to C-Innovation's claims in this action." (*Id.* ¶ 11). In other words, C-Innovation relies upon specific personal jurisdiction as opposed to general, all-purpose personal jurisdiction.[3]

The Titanic Defendants, Alta, Star, and Apollo now move to dismiss the FAC, arguing that they are not subject to personal jurisdiction in the courts of Louisiana.[4] According to the defendants, the only connection that this lawsuit has to Louisiana is that C-Innovation is located here. EMG argues that as a non-resident party that simply chartered a vessel from a Louisiana company, it is not subject to personal jurisdiction in this state, and that there is even less of a case to be made for personal jurisdiction over its affiliate, RMS Titanic, and their parent PAHL. Alta, Star, and Apollo maintain that they had no involvement in the charter party, and no operational role in Expedition 2024.

Apollo additionally argues that it was not properly served.

---

[3] The Supreme Court's decisions have recognized two types of personal jurisdiction: general and specific. *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025) (citing *Bristol-Myers Squibb Co. v. Superior Ct. of Calif.*, 582 U.S. 255, 262 (2017)). General jurisdiction lies in the forum where the defendant is domiciled or "fairly regarded as at home." *Id.*

A corporation is subject to general, all purpose personal jurisdiction in its state of incorporation and its principal place of business. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)); *Bristol-Myers Squibb Co.*, 582 U.S. 262 (citing *Daimler*, 571 U.S. at 137). The same applies to an LLC. *See Fabara v. GoFit, LLC*, 308 F.R.D. 380 (D.N.M. 2015).

It is undisputed that none of the defendant entities satisfy the test for general, all purpose personal jurisdiction in Louisiana.

[4] PacBridge is organized under the laws of the British Virgin Islands and has its principal place of business in Hong Kong. (FAC ¶ 7). The record does not reflect service on PacBridge and PacBridge has thus far made no appearance in this lawsuit.

C-Innovation argues that it can point to plenty of facts to support a prima facie case of personal jurisdiction over the defendants in Louisiana. Should the Court be inclined to disagree, C-Innovation asks for the opportunity to conduct jurisdictional discovery.

The parties' competing contentions are addressed below.

II.    Discussion

### A.

Under either admiralty jurisdiction or diversity jurisdiction, the propriety of the exercise of personal jurisdiction over a nonresident defendant will be determined in the first instance by the law of the forum state, and secondly by standards of federal due process.[5] *See Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004); *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 418 (5th Cir. 1993). Given that Louisiana's Long-Arm Statute, La. R.S. § 13:3201, extends to the full limits of federal due process, it is necessary to consider only whether the exercise of jurisdiction over a non-resident comports with due process. *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1083 (5th Cir. 1984).

Although due process does not require a nonresident's physical presence within the territorial jurisdiction of the court, the nonresident generally must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). "Specific" or

---

[5] C-Innovation alleges that a federal court has subject matter jurisdiction of this dispute under 28 U.S.C. § 1333 (admiralty), or alternatively 28 U.S.C. § 1332 (diversity jurisdiction).

"case-linked" jurisdiction "depends on an 'affiliatio[n] between the forum and the underlying controversy,'" *i.e.,* an "activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* at 283 n.6 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S. Ct. 2846, 2851 (2011)). The requisite contacts "for this kind of jurisdiction often go by the name 'purposeful availment.'" *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12–13 (2025) (citing *Ford Motor Co.*, 592 U.S. at 359). The defendant must have taken "some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* And the plaintiff's claims must "deriv[e] from, or [be] connected with," those activities. *Id.* (quoting *Goodyear*, 564 U.S. at 919).

Thus, the inquiry whether a forum state may assert specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden*, 571 U.S. at 283-84 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984)). The relationship must arise out of contacts that the "defendant himself" creates with the forum state. *Walden*, 571 U.S. at 284 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). And the "minimum contacts" analysis looks to the defendant's contacts with the forum state itself, not the defendant's contacts with persons who reside there. *Id.*

The Supreme Court has upheld the assertion of jurisdiction over defendants who have purposefully "reach[ed] out beyond" their State and into another by, for example, entering a contractual relationship that "envisioned continuing and wide-reaching contacts" in the forum State. *Walden*, 571 U.S. at 285 (citing *Burger King,* 471 U.S. at 479-80). And although physical presence in the forum is not a prerequisite to

jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact. *Id.*

The plaintiff bears the burden of establishing personal jurisdiction over the defendant, which includes pleading a prima facie case for personal jurisdiction in the forum state. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005) (citing *Felch v. Transportes Lar-Mex S.A. De CV*, 92 F.3d 320, 326 (5th Cir. 1996)). When "the district court decides the motion to dismiss without holding an evidentiary hearing, [the plaintiff] must make only a *prima facie* showing of the facts on which jurisdiction is predicated." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 342–43 (5th Cir. 2004) (citing *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir. 2002)). In determining whether a *prima facie* case exists, the court "must accept as true [the Plaintiff's] 'uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation.'" *Id.* (citing *STORMAN ASIA M/V,* 310 F.3d at 378).

Importantly, each defendant's contacts with the forum state must be assessed individually. *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984) (citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)). For instance, jurisdiction over a parent corporation does not automatically establish jurisdiction over a wholly-owned subsidiary. *Id.* (citing *Consol. Textile Co. v. Gregory*, 289 U.S. 85, 88 (1933)). Further, a plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274 (5th Cir. 2006).

The plaintiff likewise bears the burden of demonstrating the necessity of

jurisdictional discovery. *Monkton Ins. Servs. Ltd. v. Ritter*, 768 F.3d 429, 434 (5th Cir. 2014) (citing *Davila v. United States*, 713 F.3d 248, 264 (5th Cir. 2013)). A plaintiff is not entitled to jurisdictional discovery when "the record shows that the requested discovery is not likely to produce the facts needed to withstand a [motion to dismiss]." *Id.* (quoting *Freeman v. United States*, 556 F.3d 326, 342 (5th Cir. 2009)). And discovery on matters of personal jurisdiction need not be permitted unless the motion to dismiss raises an issue of fact. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000) (citing *Wyatt v, Kaplan*, 686 F.2d 276, 284 (5th Cir. 1982)). The decision whether jurisdictional discovery should be allowed lies within the trial court's discretion. *See Wyatt*, 686 F.2d at 283-84.

## B.

C-Innovation alleges that in 2023, various individuals representing EMG and RMS Titanic, specifically Troy Launay and David Gallo, contacted C-Innovation Vice President David Sheetz in Louisiana to negotiate the charter of a vessel equipped with remotely operated underwater vehicles (ROVs) to participate in an expedition to explore the TITANIC wreckage off the coast of Newfoundland, Canada, and to capture high-resolution photographs, videos, and technical scans and renderings of the wreckage.[6] (FAC ¶ 18). Launay would serve as expedition co-leader. (Rec. Doc. 25-4, David Sheetz's Unsworn Declaration, Exhibit D ¶ 5). In his unsworn declaration Sheetz

---

[6] In support of this allegation C-Innovation has produced copies of emails during the September—October 2023 timeframe. (Rec. Doc. 25-4, Exhibits D-1—D-4). But those emails indicate that David Sheetz's business office is located in Houston, Texas, and one of the emails refers to a visit to Houston, not Louisiana, by Troy Launay and David Gallo. The email chain indicates that the first contact might have been to C-Innovation's Pat Bourgeau, and not with David Sheetz.

expounds upon his early communications with Troy Launay regarding Expedition 2024 but those communications do not appear to have any connection to Louisiana. In fact, although C-Innovation was interested in providing a suitable vessel for Expedition 2024, as of the fall of 2023 C-Innovation was hesitant to commit because it was not convinced that RMS Titanic and EMG had sufficient funding to charter a vessel. (*Id.* ¶¶ 13 & 14).

Enter what appears to be the first Louisiana contact—according to Sheetz, on November 29, 2023, he was at the WorkBoat Show in New Orleans, when Launay approached him and followed up on their prior telephone discussions regarding Expedition 2024. (*Id.* ¶ 15). Sheetz describes this serendipitous meeting as "the most consequential meeting" of C-Innovation's negotiations with RMS Titanic and EMG because it was at this meeting that Launay advised that EMG and RMS Titanic had received assurances from their investors that Expedition 2024 would be fully funded. (*Id.* ¶ 16). Sheetz describes this conversation regarding funding as the "turning point" that ultimately persuaded C-Innovation to charter a vessel to RMS Titanic and EMG. (*Id.* ¶ 17).

On January 15, 2024, Launay emailed Sheetz to say that "we" would like to move things forward for Expedition 2024, discuss "next steps," and introduce Sheetz to Jessica Sanders, RMS Titanic's CEO. The discussion with Sanders would include "contract agreements, work scope, assets, scheduled, etc." (Rec. Doc. 25-4, Exhibit D-6 (email)).

According to Sheetz, over the next few months he continued to discuss Expedition 2024 with Launay and worked with him to finalize an agreement to charter a vessel. (Rec. Doc. 25-4, David Sheetz's Unsworn Declaration, Exhibit D ¶ 19). In an

email dated February 16, 2024, Launay mentioned Providence as one potential mobility port but Launay and his team expressly determined to leave that decision up to C-Innovation. (Rec. Doc. 25-4, Exhibit D-7 (email)).

On February 20, 2024, the original charter party identifying the C-FIGHTER for Expedition 2024 was executed by Jessica Sanders on behalf of EMG. (Rec. Doc. 25-4 at 47, Exhibit D). On April 15, 2024, the parties executed an addendum to the charter party changing the chartered vessel to the DINO CHOUEST, and making a few other changes. (Rec. Doc. 25-4, Exhibit D-9, Addendum). The execution of the agreement was done electronically.

On June 9, 2024, C-Innovation began the process of mobilizing or readying the DINO CHOUEST to participate in Expedition 2024, and this was done in Port Fourchon, Louisiana. (Rec. Doc. 25-4, David Sheetz's Unsworn Declaration, Exhibit D ¶ 25). On June 13, 2024, Launay came to Louisiana to personally coordinate and oversee the mobilization of the DINO CHOUEST on RMS Titanic's and EMG's behalf. (*Id.* ¶ 27). According to Pat Bourgeau, Offshore Manager for C-Innovation, Launay oversaw C-Innovation's installation of a forty-foot equivalent unit (FEU) or CONEX on the DINO CHOUEST. (Rec. Doc. 25-6, Pat Bourgeau Unsworn Declaration, Exhibit F ¶ 6). Installation of the CONEX involved loading and securing the CONEX onto the deck of the vessel and running communications, internet, video, survey, and telephone lines to the CONEX. (*Id.* ¶ 7). Launay also oversaw C-innovation's permanent remodeling of the DINO CHOUEST's library into office spaces for RMS Titanic's and EMG's personnel to use during the expedition. (*Id.* ¶ 9). Additionally, Launay oversaw C-Innovation's loading and installation of numerous other pieces of equipment aboard the DINO CHOUEST

while it remained in Louisiana, including without limitation remotely operated underwater vehicles (ROVs), launch and recovery systems (LARS) for the ROVs, control vans from which the ROVs were operated, twenty-foot equivalent units used for storage, and a mezzanine deck from which ROV operations would be conducted during the expedition. (*Id.* ¶ 10). Finally, during his time in Louisiana, Launay oversaw C-Innovation's design and fabrication of metal frames that were installed on the ROVs to house the high-definition and IMAX cameras that RMS Titanic and EMG would use to obtain footage during the expedition. (*Id.* ¶ 11). Mobilization of the DINO CHOUEST included making temporary and permanent changes to the vessel's layout and accommodations, loading and securing ROVs and related equipment onto the vessel, crewing the vessel, running sea trials, and loading food, water, fuel, and lube oil. Accomplishing this involved thousands of manhours and over a million dollars in expenses. In fact, C-Innovation has pointed out that more time was spent mobilizing/demobilizing the DINO CHOUEST in Louisiana, and sailing to and from the TITANIC than actually working over the wreckage on site.

Launay remained with the DINO CHOUEST in Louisiana until July 1, 2024, to oversee the mobilization of the DINO CHOUEST in Port Fourchon. (Rec. Doc. 25-4, David Sheetz's Unsworn Declaration, Exhibit D ¶ 27); (Rec. Doc. 25-6, Pat Bourgeau Unsworn Declaration, Exhibit F ¶ 12).

In July 2024, in accordance with the charter party, the DINO CHOUEST departed Port Fourchon, Louisiana for the TITANIC. (FAC ¶ 26). The DINO CHOUEST did not sail directly to the TITANIC but rather made port in Providence, Rhode Island, from where it then left for the North Atlantic Ocean and the TITANIC wreckage. Financial

problems surfaced while the DINO CHOUEST was *en route* to the TITANIC because EMG failed to make certain required payments under the charter party.[7] (*Id.* 27).

From July 16, 2024, through August 5, 2024, the DINO CHOUEST worked to survey the TITANIC wreckage. (Rec. Doc. 25-4, David Sheetz's Unsworn Declaration, Exhibit D ¶ 29).

The DINO CHOUEST demobilized in Louisiana from August 19, 2024, through August 21, 2024. (Rec. Doc. 25-4, David Sheetz's Unsworn Declaration, Exhibit D ¶ 31).

Again, C-Innovation is owed more than $4,000,000.00 in conjunction with chartering the DINO CHOUEST.

## C.

At the outset, it is simply absurd to suggest that the sole connection between this case and Louisiana is the plaintiff's presence here. And it is equally absurd to suggest that the sole connection to Louisiana is that one of the defendants simply executed a contract with a resident of this state. Yes, the situs of the DINO CHOUEST's work was

---

[7] Even prior to leaving Port Fourchon and suffering the first of the defaulted payments under the charter party, C-Innovation had remained circumspect of the financial support available for Expedition 2024. On June 28, 2024, Sheetz sent an email to George Mabry with defendant Alta Fundamental explaining that C-Innovation's senior management and owners had raised concerns regarding EMG's ability to honor the charter party's terms. (Rec. Doc. 25-4 at 93, Exhibit D). Given that C-Innovation would be dispatching a multi-million dollar asset thousands of miles away from its home port, C-Innovation requested that EMG place the charter hire into an escrow account pending completion of the charter party. C-Innovation explained that this would give its senior management and owners a level of comfort that the funds would be available upon the successful completion of the charter party. (*Id.*). George Mabry of Alta Fundamental simply replied that "we do not believe the Charter Hire requires an escrow deposit on our part." (*Id.*).

A few days earlier, Troy Launay had sent out an email with the subject of "EMG Management change," to advise that Jessica Sanders' role would now be filled by George Mabry. (Rec. Doc. 25-4, Exhibit D-10). The email explained that George Mabry and Giovanni Wong (PacBridge) were "the representatives for the board at EMG." (*Id.*).

located in the North Atlantic. But the DINO CHOUEST was no ordinary vessel because an ordinary vessel could not do the job of surveying the TITANIC wreckage. Troy Launary did not come to Louisiana to find a suitable vessel simply because he liked the food here. It is a long way between Port Fourchon, Louisiana and the North Atlantic. Launay came to Louisiana to obtain a vessel for Expedition 2024 because C-Innovation was not only able to provide a vessel equipped with the technology necessary to carry out the mission, but was also willing to work with him to modify the DINO CHOUEST to meet RMS Titanic's and EMG's specifications. Even if the DINO CHOUEST did not go "on hire" until it left Providence for the North Atlantic (an assertion contrary to the terms of the charter party), the vessel nonetheless had to leave its home port in Louisiana to get there. The connections between this dispute and Louisiana are abundant. Of course, where personal jurisdiction is concerned the connection must be shown as to each defendant.

  Aside from the conversation at the WorkBoat show where Launay either intentionally gave C-Innovation false information regarding funding for Expedition 2024 or inadvertently passed on false assurances that investors like Alta, Star, and Apollo had given to Launay, it remains that Launay came to Louisiana and stayed in Louisiana to oversee the outfitting of the DINO CHOUEST to ensure that it met the specifications necessary to perform under the charter party. Launay was on board the DINO CHOUEST as RMS Titanic's corporate representative for the entire survey mission. The Court is persuaded that Launay's contacts with Louisiana are sufficient to satisfy a prima facie showing of specific personal jurisdiction as to RMS Titanic and EMG, the vessel charterer, on all claims asserted in the lawsuit.

As for the remainder of the defendants, including the parent entity PAHL (of RMS Titanic and EMG) a little more factual development is necessary. The same holds true of the investor defendants although Mabry's conduct after Jessica Sanders left RMS Titanic does raise questions about whether the investor defendants were quite as passive as they now contend. And it is certainly possible that Launay's contacts with Louisiana may be imputable to some of the other defendants in the case. C-Innovation makes a persuasive case that jurisdictional discovery is appropriate so that the true relationship between the chartering of the DINO CHOUEST for Expedition 2024 and the other defendants can be explored and understood.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Dismiss for Lack of Personal Jurisdiction (Rec. Doc. 15)** filed by Premier Acquisition Holdings, LLC, RMS Titanic, Inc., and Experiential Media Group 'EMG' LLC is **DENIED** as to RMS Titanic, Inc., and Experiential Media Group 'EMG' LLC and **DENIED WITHOUT PREJUDICE** as to Premier Acquisition Holdings, LLC.

**IT IS FURTHER ORDERED** that the **Motion to Dismiss for Lack of Personal Jurisdiction (Rec. Doc. 16)** filed by Alta Fundamental Advisers SP LLC and Star V Partners LLC, and the **Motion to Dismiss for Lack of Personal Jurisdiction and Insufficient Service of Process (Rec. Doc. 19)** filed by Apollo Credit Strategies Master Fund Ltd. are **DENIED WITHOUT PREJUDICE**. Apollo's motion to dismiss for failure to properly serve is **DENIED**.

**IT IS FURTHER ORDERED** that jurisdictional discovery shall commence immediately. On or before **March 31, 2026**, the plaintiff shall file into the record a

jurisdictional discovery plan.

March 4, 2026

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE